**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANIEL DALY, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO: 5:23-cv-04035 |
| | : | |
| v. | : | |
| | : | |
| RESTORE INTEGRATIVE WELLNESS, LLC | : | |
| | : | |
| | : | Jury Trial Demanded Pursuant to |
| Defendant | : | F.R.C.P. 38(b) |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Daniel Daly respectfully submits this Memorandum in Opposition to Defendant Restore Integrative Wellness, LLC's ("Restore") Motion for Summary Judgment. Contrary to Defendant's assertion that Mr. Daly cannot satisfy the elements of his claims under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), the factual record developed in discovery contains ample evidence from which a reasonable jury could conclude that Mr. Daly was subject to disability-based discrimination, a hostile work environment, retaliation, and constructive discharge.

Under the McDonnell Douglas burden-shifting framework, once a plaintiff establishes a prima facie case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for its action. The burden then shifts back to the plaintiff to prove that this stated reason is a pretext for unlawful discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994).

In this case, Defendant Restore Integrative Wellness, LLC ("Restore") has asserted that its decision to discipline and eventually force the resignation of Plaintiff Daniel Daly was due to

performance-related issues. However, the record—when viewed in the light most favorable to Mr. Daly—reveals significant evidence from which a jury could reasonably conclude that these stated reasons were pretextual and that Defendant (1) targeted Mr. Daly because of a request for reasonable accommodation was made on his behalf, (2) Mr. Daly was subjected to an atmosphere of discrimination and harassment and (3) Mr. Daly was retaliated against for reporting the discrimination.

## I.    STATEMENT OF FACTS

Plaintiff Daniel Daly was hired by Defendant Restore Integrative Wellness, LLC ("Restore") in November 2021 as a Floor Supervisor at its Doylestown, Pennsylvania dispensary. From the outset, Daly was open with his employer about his congenital disability, Thrombocytopenia Absent Radius (TAR) Syndrome, which severely limits the function of his arms. Daly informed his supervisor, Christopher Harren, of his disability on his first day of employment, and this fact was known by both HR and management throughout his tenure. Despite this, Daly worked diligently and capably in his position. Specifically, James Francis Bonner, former Director of People and Culture at Restore Integrative Wellness, testified that:

```
10 A. Outside of any, you know, temporary
11 friction, I would say, between Paul and Dan
12 in that situation, it seemed to have
13 resolved itself, I think Dan performed as
14 well as anybody else. I didn't have any,
15 you know, he -- he's not performing the
16 duties, he's late. I didn't get any of
17 that. He was a good employee, like anybody
18 else, I would say, yes.
```

(Ex. A, Bonner Dep., 45:10-18, a true and correct copy is attached hereto as Exhibit "A"). Furthermore, Jim Bonner confirmed that Daly's disability was known to management: "he has

some physical limitations that might be obvious, and people would say, you know, who is the new guy… any obvious differences. I just mean like you see Dan" (Ex. A, Bonner Dep. 29:6–11).

### 1. Restore used its Work Policies to Target Employees

The record demonstrates that Restore Integrative Wellness Center selectively and inconsistently applied its employee handbook policies in handling Dan Daly's disciplinary process, raising significant questions of pretext. According to the Restore Integrative Wellness Center handbook, the company follows a **progressive discipline policy** for "B-level" infractions that begins with a teaching moment, then a verbal warning, followed by up to four written warnings before termination (Restore Handbook at p. 21, a true and correct copy is attached hereto as Exhibit "B"; Ex. A, Bonner Dep. 87:8–88:6). However, Daly was never given any verbal warnings, and instead was issued a "final written warning" on June 16, 2022—just one day after he reported discriminatory treatment by his supervisor, Paul Wakeham (Ex. A, Bonner Dep. 42:1–5; 45:25–46:1; 77:1–5; Def.'s Br. Ex. B, Daly Dep. 59–60). Bonner explicitly testified that Daly's situation did not follow the prescribed disciplinary process and acknowledged that management "didn't go step-by-step with Dan on anything that I was involved in" (Ex. A, Bonner Dep. 88:15–16).

Bonner further testified that the company's anti-retaliation policy was not effectively communicated or enforced. Although the policy was later included in an employee handbook, Bonner stated, "it wasn't like a cultural thing to be, like, 'Yes, you can speak up'… it was not invoked while I was there formally" (Ex. A, Bonner Dep. 53:13–18). When asked whether such policies were established and routinely discussed, Bonner admitted, "Not yet, anyway" (Ex. A, Bonner Dep. 54:2).

The inconsistent and arbitrary application of disciplinary actions at Restore is exemplified by the testimony of former lead manager Christopher Harren. Despite consistently performing his

job duties without issue—indeed, receiving positive recognition and a raise shortly before being placed on a Performance Improvement Plan ("PIP")—Harren was subjected to a disciplinary process he firmly disagreed with and considered unjustified. Harren explicitly testified that the items listed on his PIP were tasks he consistently performed correctly, noting, "every single one of those items on there was something that I not only had to do every single day, but I did do correctly every single day," and further emphasizing the inherent contradiction, stating, "If I did any of those one things wrong, I would have been a disciplinary action, right?" (Def.'s Br. Ex. G, Harren Dep., 30:21–31:1). Moreover, Harren confirmed that management frequently included issues on disciplinary forms and PIPs that did not align with reality, affirming, "they had no clue what was actually happening" (Def.'s Br. Ex. G, Harren Dep., 31:10–14).

This departure from standard procedure is further underscored by Bonner's testimony that managers "would skip [steps] in other instances if they *were urgently*" looking to discipline someone but admitted that such practices were "not great" and not best practice (Ex. A, Bonner Dep. 87:12–89:5) (emphasis added). In contrast, Bonner emphasized that following the handbook's progressive model was "best practice" and what he himself sought to uphold (Ex. A, Bonner Dep. 89:13–21).

Additionally, the June 16, 2022, disciplinary write-up cited "abusing break time" and "refusal to stay late" as infractions. Yet Bonner testified that **there was no written policy setting specific break schedules** (Ex. A, Bonner Dep. 91:7–15; 93:1–11). Rather, employees were <u>entitled</u> to one or more 15-minute breaks and a 30-minute meal break, depending on the length of their shift (Ex. A, Bonner Dep. 91:1–2). Bonner confirmed that no policy or handbook provision specified when breaks had to be taken (Ex. A, Bonner Dep. 93:1–5). Instead, employees typically requested permission from a manager before taking a break, and managers assessed whether

coverage allowed it at that time (Ex. A, Bonner Dep. 92:1–3). While some locations, such as Lancaster, managed breaks with a whiteboard schedule, others were more informal (Ex. A, Bonner Dep. 91:10–14). Complaints about break abuse were relatively uncommon and tended to be location-specific; Bonner could not recall any related to the Doylestown store where Plaintiff worked (Ex. A, Bonner Dep. 92:11–20). Notably, when asked whether employees knew what the break policy was, Christopher Harren responded by saying "No, probably not." (Def.'s Br. Ex. G, Harren Dep., 67:5-10).

He also confirmed that Daly worked in a "key" position, and while keys might be asked to stay late, there was no policy or employee agreement requiring them to do so (Ex. A, Bonner Dep. 95:14–97:9). Bonner went further, affirming, "we don't have mandation and we don't have any sort of contractual obligations for the employee," and said he "wouldn't have put that in there, like forced to stay or anything" (*Id.*).

Moreover, the decision to issue Daly a final warning without prior steps is especially suspect when viewed in light of his protected activity. On June 15, 2022, Daly emailed HR Director Bonner expressing concerns about a hostile interaction with Wakeham, including learning that Wakeham had said he "almost punched a cripple"—a slur directed at Daly's disability (6/15/2022 D. Daly Email to J. Bonner, a true and correct copy is attached hereto as Exhibit "C"), June 15, 2022; Ex. A, Bonner Dep. 35:22–36:3). Rather than initiating an investigation or applying the complaint procedure outlined in the handbook (Ex. B, Restore Handbook at p. 6), Daly was given a final written warning the next day threatening termination, which Bonner acknowledged was unusual (Ex. A, Bonner Dep. 97:21–98:2). Specifically, Bonner testified "No I wouldn't say I typically see that." (*Id.*).

## 2.  The Discrimination by Paul Wakeham against Dan Daly.

Paul Wakeham exhibited oppressive and discriminatory behavior throughout Daniel Daly's employment at Restore Integrative Wellness, notably marked by consistently negative and dismissive interactions. Dan Daly testified specifically about Wakeham frequently giving him attitude and visibly expressing frustration, particularly when Daly required additional time to perform tasks due to his disability (Def.'s Br. Ex. B, Daly Dep., 40:23-41:24). Daly explicitly recounted Wakeham's visible impatience and harsh treatment when he fulfilled orders, stating he was treated distinctly worse than his coworkers without disabilities (Def.'s Br. Ex. B, Daly Dep., 42:2-23).

This oppressive conduct began early in Daly's employment. Becky Koval confirmed that within 90 days of Daly's hiring in February 2022, management was already aware of serious issues involving Wakeham's conduct toward Daly (Becky Koval Dep., 59:6-60:20, a true and correct copy is attached hereto as Exhibit "D"). Dan Daly would get attitude from Paul Wakeham because it would take him slightly longer to do something due to his disability and Wakeham's behaviors would make Daly feel like an outsider (Ex. A, Bonner Dep. 41:5-42:13). This discriminatory behavior was not isolated to Wakeham as another coworker with the name "Pip" also treated Daly poorly because of his disability; indeed, Pip and Wakeham "would start slamming stuff if [Daly] came back and stuff like that, be very attituy towards [Daly], kind of rude." (Def.'s Br. Ex. B, Daly Dep. 42:7-23). As a result of the oppressive conduct, on June 15, 2022, Dan Daly contacted Jim Bonner via email to raise concerns about the oppressive and discriminatory behavior of Paul Wakeham. (Ex. C, 6/15/2022 Dan Daly Email to J. Bonner). Bonner also testified he did not document or escalate Daly's concerns to senior leadership in accordance with the handbook's official complaint process (Ex. A, Bonner Dep. 99:3–25; Ex. B, Restore Handbook at pp. 5–6).

Moreover, Defendant was aware of Wakeham's problematic behavior; Christopher Harren described an incident in which Wakeham made inappropriate advances toward another employee, Paige Franklin. Harren characterized Wakeham's conduct as "creepy" and harassing, further demonstrating Wakeham's unchecked misconduct in the workplace (Def.'s Br. Ex. G, Harren Dep., 51:18-53:25). Harren also noted that although Wakeham faced some disciplinary action for this inappropriate behavior, the discipline failed to meaningfully correct or deter his ongoing misconduct (*Id.*).

James Bonner, the Human Resources representative, provided additional testimony that Daly repeatedly reported feeling targeted by Wakeham. Bonner confirmed that Daly had raised concerns to HR about being targeted by Wakeham which had been contributing significantly to a hostile work environment (Ex. A, Bonner Dep., 76:13-24). Moreover, Christopher Harren also received notice of concerns from Dan Daly of his problems with Paul Wakeham's behaviors within 90 days of Dan Daly's start date. (Def.'s Br. Ex. G, Harren Dep. 56:2-23).

At some point during Daly's employment, Daly and Assistant Manager Paul Wakeham were involved in a workplace dispute. Bonner testified that upon investigating the conflict, he was told by Daly that Wakeham "was very argumentative and kind of targeting him, and, you know, a real jerk" (Ex. A, Bonner Dep. 35:10–14). Wakeham admitted to Bonner that he had called Daly "a prick" and described Daly as "entitled" (Ex. A, Bonner Dep. 35:22–36:3). While Wakeham later walked back those comments, they coincided with a broader pattern of hostility toward Daly following a disclosure of physical limitations.

A few weeks after the incident, Bonner followed up with Daly, who reported: "I do have trouble reaching things sometimes" (Ex. A, Bonner Dep. 36:10–15). Bonner, recognizing the issue, raised the matter with management and proposed a reasonable accommodation: "We may need to

get a step stool or something for Mr. Daly" (Ex. A, Bonner Dep. 36:17–18). The response from senior management was dismissive. Bonner recalled that "their responses were, you know, 'He should be able to do the job like anybody else. That's how he was hired'" (Ex. A, Bonner Dep. 36:19–21). When Bonner pursued the issue further, he was told by Koval and others that a step stool would not be provided because it would be a "tripping hazard" (Ex. A, Bonner Dep. 40:15–16). Bonner was not aware of any other accommodations being offered and confirmed, "there would be no other adjustments" (Ex. A, Bonner Dep. 41:2–3).

Following this request for accommodation, management discussions began targeting Daly for removal because of the accommodation request and his disability. Bonner testified that Becky Koval stated, "He may be a problem, Paul doesn't like him, you know, let's just phase him off the schedule" (Ex. A, Bonner Dep. 48:19–21). Bonner objected to this course of action, telling Koval, "that's a little bit — I don't know if that's best practice. Maybe we should talk to Dan and Paul…" (Ex. A, Bonner Dep. 48:22–25). Nonetheless, no formal performance management process was initiated. Daly was never given a performance evaluation or a performance improvement plan (Ex. A, Bonner Dep. 45:25–46:1; 42:1–5), and Bonner was not involved in any formal disciplinary write-up for Daly (Ex. A, Bonner Dep. 46:20–21; 47:1–2).[1]

Shortly after the request for the accommodation, Daly became the target of demeaning and hostile conduct. In early March 2022, Daly was issued his first formal disciplinary write-up. Two months later, on May 4, Daly was written up again, this time for allegedly refusing to stay late and making mistakes in counting the cash drawer.

---

[1] Notably, Christopher Harren claims a performance improvement plan was created for Dan Daly and exists written form, in contradiction with James Bonner's testimony, but no such form exists as it was never produced in discovery. (Harren Dep., 43:9-18; 57:10-22; 19:6-16).

Despite the early indications of Wakeham's discriminatory behavior, Wakeham continued his hostile and discriminatory actions unabated. Daly specifically testified that Wakeham derogatorily referred to him as a "cripple," an incident acknowledged by management yet inadequately addressed (Def.'s Br. Ex. B, Daly Dep., 44:7-46:5). As a result of this behavior, Mr. Daly "didn't feel safe going into work because we [Dan and Paul Wakeham] were scheduled together." 46:1-5. Nonetheless, management ignored Daly's concerns, made no remedial steps and required that Daly continue to work with Paul Wakeham. *Id.*

Daly reported this incident to Harren and HR Director Jim Bonner on June 15, 2022 (Complaint ¶ 24; Ex. C, Daly Email to J. Bonner). Rather than investigate or address the complaint, Harren responded by accusing Daly of being "unprofessional" and initiating disciplinary action (Complaint ¶ 26). Daly was issued a "final warning" the very next day, June 16, 2022—confirming that protected conduct was followed immediately by materially adverse action (Ex. A, Bonner Dep. 77:1–5; Def.'s Br. Ex. B, Daly Dep. 59–60; Complaint ¶ 27). The write-up carried a warning that any future issues would result in termination. Daly was offered no recourse, no accommodation, and no performance review process—only the threat of immediate termination. Wakeham later admitted to making the comment. (Def.'s Br. Ex. G, Harren Dep. 48:1–5.) Notably, Wakeham remained in a supervisory position over Daly following the incident. He was not suspended, reassigned, demoted, required to complete anti-discrimination training, or even removed from managing Daly's day-to-day work.

Daly resigned shortly thereafter, testifying that he believed termination was imminent and that the work environment had become intolerable. He described feeling humiliated and marginalized, stating that he felt that he was at risk of physical violence from Wakeham while working for the Defendant. (Def.'s Br. Ex. B, Daly Dep. 73:23-75:6; 82:12-83:4.)

Taken as a whole, these facts establish that Daly was not only denied the accommodation to which he was entitled under the ADA, but was retaliated against for asserting his rights. The escalating pattern of disciplinary write-ups—each vague, unsupported, and temporally connected to Daly's efforts to challenge discriminatory behavior—demonstrates a pretextual rationale. That Restore shielded Wakeham while punishing Daly, and ignored corroborating warnings from another manager, reflects an institutional failure that ultimately forced Daly to resign in the face of mounting hostility and impending termination.

## II.    ARGUMENT

Under the ADA, an employer is prohibited from discriminating against, "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a), Discrimination. A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8), Definitions. A "disability" is: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2), Definitions.

Third Circuit in *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999).

[The U.S. Court of Appeals for the Third Circuit has] held that in order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.

*Id*. at 306 (quotation marks omitted). The term "discrimination" in this context encompasses not only adverse employment actions driven by prejudice but also includes an employer's failure to make reasonable accommodations for the plaintiff's disabilities. Continuing, the court addressed the issue of reasonable accommodations. "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Id*. After a discussion of the Equal Employment Opportunity Commission's Compliance Manual, and its rules and regulations, the Court addressed an issue of the utmost significance to this case; that being, knowledge of the disability on the part of the employer.

What matters under the ADA are not formalisms about the manner of the request [for reasonable accommodation], but whether the employee or a representative for the employee *provides the employer with enough information that*, under the circumstances, the employer *can be fairly said to know of both the **disability** and **desire for an accommodation***.

*Id*. at 313 (emphasis added).

### A. PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION UNDER THE ADA AND PHRA, AND RECORD SHOWS HE WAS TARGETED FOR HOSTILE TREATMENT AND DISCIPLINE AFTER REQUESTING A REASONABLE ACCOMMODATION FOR HIS DISABILITY.

Defendant's argument that Plaintiff cannot establish a prima facie case of discrimination or demonstrate pretext under the *McDonnell Douglas* burden-shifting framework is contradicted by both the pleadings and testimonial evidence. Plaintiff satisfies each element of a prima facie case under the ADA and PHRA. Plaintiff has a recognized disability, TAR syndrome—a congenital condition that limits major life activities and results in visible physical impairment (Complaint ¶¶ 3–5). Defendant does not contest that Plaintiff was a qualified individual capable of performing

the essential functions of his position with or without reasonable accommodation; indeed, testimony from HR Director James Bonner confirms that Plaintiff "performed as well as anybody else" and was "a good employee, like anybody else" (Ex. A, Bonner Dep. 45:13–18). Finally, Plaintiff experienced an adverse employment action: he was issued a "final warning" write-up and verbally reprimanded within 24 hours of reporting discriminatory conduct by a supervisor (Complaint ¶¶ 26–27), resulting in constructive discharge (¶ 28).

It is well-established that disparate treatment of similarly situated employees may serve as compelling evidence of pretext. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). When an employer imposes harsh discipline on one employee but affords leniency to another employee engaged in more serious misconduct, and where the differential treatment correlates with a protected status or activity, courts routinely find such evidence probative of unlawful motive. *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

In his deposition, James Bonner described Restore Integrative Wellness's **progressive disciplinary process** as outlined in the employee handbook. The process was designed to begin with a *teaching moment*—a verbal conversation or coaching session documented via email or informal note (Ex. A, Bonner Dep. 87:8–11). If conduct issues persisted, the process was to escalate to a *verbal warning*, followed by *up to four written warnings* for Category B infractions, ultimately leading to *termination* if corrective actions failed (Ex. A, Bonner Dep. 87:21–88:6). Bonner acknowledged that while this was the formal policy "on the paper," it was not consistently followed. In Plaintiff Dan Daly's case, Bonner confirmed that the step-by-step procedure was **not followed**, stating: "We didn't go step-by-step with Dan on anything that I was involved in" (Ex. A, Bonner Dep. 88:15–16).

Bonner further testified that although the progressive process was intended to be standard, **management sometimes skipped steps**, particularly in perceived urgent situations, and Daly was not the only employee subjected to such deviation (Ex. A, Bonner Dep. 88:22–89:5). Nonetheless, he emphasized that following the progressive model was *best practice* and something he aimed to uphold when involved (Ex. A, Bonner Dep. 89:14–21).

Daly, however, was issued a final warning without any prior disciplinary steps, such as verbal warnings or four written warnings—as Daly was only issued three B-level infractions (Ex. A, Bonner Dep. 88:15–16), a deviation Bonner acknowledged was not consistent with best practice and likely the result of management choosing to bypass procedure (Ex. A, Bonner Dep. 88:22–89:5). Moreover, the specific infractions cited in Daly's write-up are inconsistently applied. Bonner confirmed there was no formal policy specifying when employees had to take breaks (Ex. A, Bonner Dep. 93:1–5), and break timing was at the discretion of local managers (Ex. A, Bonner Dep. 91:7–15). Similarly, no policy required employees to stay late beyond their shifts, and Bonner testified that Restore "doesn't have mandation" and no contractual obligation existed requiring extended hours (Ex. A, Bonner Dep. 96:18–24). These admissions directly support the Complaint's assertion that Restore used its write-up system as a pretext to penalize Plaintiff for engaging in protected conduct and requesting accommodation (Complaint ¶¶ 31–33).

Contrary to Defendant's assertion, the record demonstrates a clear causal nexus between Plaintiff's disability, his request for accommodation, and the adverse action. Prior to June of 2022[2], Plaintiff informed Bonner that he had trouble reaching products due to his disability. Bonner raised the issue with management and suggested a reasonable accommodation—a step stool (Ex. A, Bonner Dep. 36:10–18). Management dismissed the request, with Becky Koval and Megan

---

[2] Initially James Bonner testified that it was the fall of 2022 but he later corrected himself to June of 2022 or earlier. Bonner Dep. 61:4–13)

McElheny stating that Plaintiff should "be able to do the job like anybody else" and rejecting the step stool as a "tripping hazard" (Ex. A, Bonner Dep. 36:19–21; 40:15–16). No alternative accommodation was offered, and management explicitly stated, "there would be no other adjustments" (Ex. A, Bonner Dep. 41:2–3). Shortly thereafter, Plaintiff's supervisor, Paul Wakeham, began referring to Plaintiff as "entitled" and a "prick" (Ex. A, Bonner Dep. 35:22–36:3), and HR was informed that Wakeham "didn't like [Dan]," leading Koval to suggest "let's just phase him off the schedule" (Ex. A, Bonner Dep. 48:19–21). Bonner raised concerns about the legality and fairness of this approach, but no performance improvement plan was implemented and no documentation existed regarding job deficiencies (Ex. A, Bonner Dep. 45:25–46:1; 47:1–2). Indeed, Bonner confirmed that Plaintiff had received no performance evaluation at all (Ex. A, Bonner Dep. 42:1–5).

Defendant's management not only tolerated, but orchestrated and appeared to encourage the discriminatory targeting of Plaintiff following the request for a reasonable accommodation related to his disability by James Bonner, which was precipitated by Plaintiff's concerns regarding his inability to reach certain things at work. This targeting came into fruition on June 15, 2022, after Mr. Daly reported Wakeham's discriminatory statement ("I almost punched a cripple") to General Manager Chris Harren, Plaintiff was immediately accused of being "unprofessional" and issued a final warning the next day (Complaint ¶¶ 24–27). This "discipline"—for the alleged use of inappropriate language and performance issues—followed no standardized process, violated Defendant's claimed policies, and was applied inconsistently (Ex. A, Bonner Dep. 26:1–27:19). Bonner testified that disciplinary write-ups were often used selectively and that performance improvement plans were not regularly employed or documented (Ex. A, Bonner Dep. 24:1–25:22).

Here, the contrast between Daly and Assistant Manager Paul Wakeham is striking. Wakeham engaged in undisputed, intentional misconduct by making an egregious, explicitly ableist statement about Daly, stating, "I've never wanted to beat up a cripple so bad." Def.'s Br. Ex. B, Daly Dep. 44:10–25. Wakeham admitted making the statement (Def.'s Br. Ex. G, Harren Dep. 48:1–5), and both Harren and HR Director Becky Koval confirmed that he was formally reported for it. Def.'s Br. Ex. G, Harren Dep. 47:23–25; Koval Dep. 61:2–20. Daly immediately raised the issue with both HR and management, constituting protected activity under the ADA. *Id.* Despite this severe violation of company policy and federal anti-discrimination laws, Wakeham was permitted to retain his supervisory authority over Daly and faced no meaningful disciplinary repercussions. Harren testified that Wakeham was merely "written up" (Def.'s Br. Ex. G, Harren Dep. 48:2–6), and Koval could not recall whether Wakeham received any follow-up coaching, training, demotion, or suspension. Koval Dep. 61:9–20; 62:1–25. There is no evidence that Restore removed Wakeham from supervisory duties or took any steps to ensure Daly would not be subject to continued oversight by the individual who had demeaned his disability in threatening terms.

In stark contrast, Daly—whose only "offense" was reporting Wakeham's conduct and questioning the legitimacy of vague disciplinary actions—was subjected to a disciplinary write-up which threatened termination. Def.'s Br. Ex. B, Daly Dep. 59:12–25, 61:21–25, 64:9–25. His final write-up, issued on June 16, 2022, warned that any further issues would result in termination. Id. at 65:1–11. This aggressive disciplinary trajectory directly followed Daly's protected complaint and culminated in what was effectively a constructive discharge, as Daly resigned shortly thereafter in a work environment that had become intolerable. Id. at 72:10–22.

Not only does this differential treatment undermine the credibility of Restore's stated rationale, but it also exposes a double standard: Daly was punished for asserting his rights, while

Wakeham was protected despite flagrantly violating federal law and internal policy. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322–23 (3d Cir. 2000) (finding evidence of pretext where plaintiff was disciplined for minor infractions while male coworkers were not disciplined for more serious misconduct).

This sequence of events raises a strong inference of pretext. Defendant's proffered justification—a generic performance write-up—lacks contemporaneous documentation, objective support, or consistency with treatment of similarly situated employees (Complaint ¶¶ 29–33; Ex. A, Bonner Dep. 42:6–43:4). As the Third Circuit has held, "a plaintiff may survive summary judgment by submitting evidence from which a factfinder could disbelieve the employer's articulated legitimate reason" or conclude that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Here, Plaintiff has done both.

The testimony supports that management viewed Plaintiff's disability as a problem, refused accommodation, tolerated and even echoed discriminatory language, and then disciplined Plaintiff immediately after he engaged in protected activity. These "inconsistencies, incoherencies, or contradictions" are more than sufficient to defeat summary judgment. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997).

The contention that the Complaint does not "raise" the form of discrimination alleged is unfounded. The Complaint explicitly alleges that Plaintiff was denied accommodation (Compl. ¶ 22), targeted with derogatory and discriminatory statements (Compl. ¶ 23), retaliated against for reporting those statements (Compl. 24–27), and constructively discharged (Compl. ¶ 28). The factual basis and legal theory supporting disability discrimination, retaliation, and hostile work

environment are clearly articulated in Counts I–IV of the Complaint and are substantiated by the documents and testimony obtained in discovery.

Moreover, the record indicates that Wakeham's conduct was not an isolated lapse. James Bonner, the HR Director at Restore, and Christopher Herran, Dan Daly's manager, both testified that Wakeham had a pattern of targeting and harassing employees, including Daly and a couple that worked at the Doylestown location. (Ex. A, Bonner Dep., 37:14-386; Def.'s Br. Ex. G, Harren Dep., 51:18-53:25). This testimony suggests a pattern of discriminatory or retaliatory behavior by Wakeham toward more vulnerable or outspoken employees. Yet, Restore failed to intervene meaningfully, sending a clear message that such conduct was either condoned or ignored.

These facts, viewed in the light most favorable to Daly, raise genuine issues of material fact and preclude summary judgment.

B. **THE DISCIPLINARY ACTIONS CLOSELY FOLLOWED PLAINTIFF'S PROTECTED ACTIVITY, SUPPORTING AN INFERENCE OF RETALIATION AND PRETEXT.**

Under both the Americans with Disabilities Act (ADA) and the Pennsylvania Human Relations Act (PHRA), it is unlawful for an employer to retaliate against an employee for opposing discriminatory conduct or for making a good faith complaint of such conduct. See 42 U.S.C. § 12203(a); 43 P.S. § 955(d). In retaliation claims under these statutes, the Third Circuit has long held that close temporal proximity between protected activity and adverse employment action is sufficient, on its own, to raise an inference of causation. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003); *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005). Furthermore, where an employer fails to investigate or sanction a known bad actor, while punishing the complainant, courts have routinely held such facts to support an inference of retaliatory motive. *See Moore v. City of Phila.*, 461 F.3d 331, 348 (3d Cir. 2006) (reversing

summary judgment where employer failed to discipline alleged harassers but disciplined plaintiff following her complaints); The Supreme Court has made clear that where unlawful retaliation is claimed, the plaintiff need only show that an action is "materially adverse" in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co.*, 126 S. Ct. at 2415.

The record clearly establishes that Plaintiff Daniel Daly was subjected to unlawful retaliation following his protected activity, specifically reporting discriminatory treatment related to his congenital disability. Daly, who was openly forthcoming about his disability upon his hiring at Restore Integrative Wellness, LLC. Indeed, the testimonies of HR Director Becky Koval and former Director of People and Culture James Francis Bonner confirm that, prior to his complaints about discriminatory conduct, Daly was considered a competent and capable employee without recorded performance issues

Here, the record demonstrates that Plaintiff Daniel Daly engaged in protected activity on or about June 10, 2022, when he became aware that Assistant Manager Paul Wakeham made a reprehensible and explicitly ableist comment about him, stating, "never in [Paul's] life he had wanted to hit a cripple." (Def.'s Br. Ex. B, Daly Dep. 44:10–45:2). Daly testified that this comment was relayed to him by coworkers who were present when Wakeham made the statement, and that he immediately informed Human Resources and his direct supervisor, Christopher Harren. *Id.*; *see also* Def.'s Br. Ex. G, Harren Dep. 47:23–25, 48:1–5; Koval Dep. 61:2–20. The derogatory nature of the statement, which references violence and explicitly invokes Daly's physical disability (Thrombocytopenia Absent Radius Syndrome), squarely falls within the category of discriminatory harassment under the ADA.

Wakeham admitted to making the statement, as both Harren and Koval confirmed. Harren testified: "He [Wakeham] said he did say it. He apologized for it and was written up" (Def.'s Br. Ex. G, Harren Dep. 48:2–6). Yet despite the acknowledged seriousness of the slur, Wakeham was permitted to remain in a supervisory role over Daly and was not removed from his position or investigated under any anti-harassment protocol. Daly testified that upon reporting the comment to HR and his supervisor, no one followed up with him to address his concerns or to inform him of any remedial steps taken beyond a perfunctory verbal warning to Wakeham. This lack of a meaningful response further exacerbated the hostile atmosphere and gave rise to a reasonable belief that Daly's concerns were not being taken seriously.

Critically, just a day after of reporting this discriminatory incident to HR—on June 16, 2022—Daly was issued his third formal disciplinary write-up. (*See* 6/16/2022 Daly Disciplinary Form). That write-up stated unequivocally that any further issues would result in immediate termination. *See* Exhibit E to Def. MSJ. This write-up, which directly followed Daly's complaint, was not supported by any new performance-related incidents and instead cited vague allegations of "provoking a manager [Paul Wakeham] to act unprofessionally" and "using offensive language to describe an occurrence with a manager;" both allegations seemingly arising from Plaintiff's response to being threatened and called a cripple. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (opposition to discriminatory practices constitutes protected activity even if the underlying conduct ultimately is not found to be discriminatory).

In assessing whether an employer's asserted non-discriminatory reason for taking adverse action is pretextual, courts consider whether the rationale is supported by objective, contemporaneous documentation and whether it reflects a consistent and legitimate application of internal policies. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). Abrupt and

unsubstantiated disciplinary action following a long period of satisfactory performance, particularly when temporally close to protected activity, is a classic hallmark of pretext. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001).

The temporal proximity between Daly's protected complaint (June 10) and the adverse action (June 16) creates a compelling inference of retaliatory intent under well-established Third Circuit precedent. In *Shellenberger*, the court held that a temporal gap of ten days between the plaintiff's protected activity and her adverse employment action was sufficient, standing alone, to raise an inference of retaliation. *Shellenberger*, 318 F.3d at 189. Here, the gap is only six days— and is reinforced by other circumstantial evidence of retaliatory motive, including:

- Restore would use disciplinary policies inconsistently;
- Restore did not follow any anti-retaliation policies or anti-discrimination policies;
- The vagueness and subjectivity of the performance criticisms lodged against Daly in all three write-ups;
- Koval also testified that Daly was not placed on a Performance Improvement Plan (PIP), nor did she recall any attempts to offer coaching, accommodation, or structured feedback before initiating formal discipline;
- The disparity in treatment between Daly and Wakeham, who engaged in unambiguously discriminatory conduct but faced minimal consequences;
- when disciplinary forms and performance improvement plans were utilized, management frequently completed them with details that did not accurately reflect reality, largely because management had "no clue what was actually happening." Def.'s Br. Ex. G, Harren Dep., 31:7-14; and
- Indeed, the disciplinary process was used as a retaliatory vehicle against employees that spoke out against business practices, such as inadequate hiring. Def.'s Br. Ex. G, Harren Dep., 20:15-21:6. Christopher Harren was disciplined for reporting inadequate hiring; this was his only disciplinary action during his employment at Restore. Koval Dep. 50:8–20; 52:2–53:17.

Moreover, Director of Operations Becky Koval admitted during her deposition that there were no performance evaluations conducted in 2021 and 2022. Koval Dep. 27:15-25. Daly received his first disciplinary write-up on March 3, 2022; the second on May 4, 2022; and the third—and final—on June 16, 2022, just six days after Daly reported Wakeham's discriminatory slur to HR.

This rapid escalation—moving from zero documented concerns to near-termination in barely 100 days—raises significant questions about the genuineness of Defendant's stated reasons.

The absence of any documented deficiencies prior to March 2022 not only undermines Restore's claimed rationale but also suggests that the subsequent disciplinary actions may have been manufactured or inflated to mask retaliatory motives. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (holding that inconsistencies and failure to document performance concerns undermined employer's credibility and supported finding of pretext). Courts have recognized that disciplinary actions taken suddenly and without foundation—particularly when they follow protected activity—support a reasonable inference of discrimination or retaliation. See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504–05 (3d Cir. 1997) (noting that lack of prior discipline undercuts employer's argument that plaintiff was a problematic employee).

Furthermore, the lack of objective, verifiable performance metrics—combined with Restore's failure to engage in progressive discipline—makes the credibility of its proffered reasons deeply suspect. This disparate approach to discipline—wherein a disabled employee receives three escalating write-ups in three months for minor or vague issues, while his supervisor makes an overtly discriminatory and threatening statement and faces only a nominal reprimand—further reinforces the inference of discriminatory or retaliatory motive.

Given the well-established rule that temporal proximity may suffice to raise an inference of causation at the summary judgment stage, especially when supported by a pattern of adverse treatment and disparate discipline, summary judgment on Daly's retaliation claim is inappropriate. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) (reversing summary judgment where adverse action occurred weeks after protected conduct and where the employer's stated reasons were disputed).

In sum, the absence of internal documentation, and the sudden imposition of formal discipline after his protected activity suggest that Defendant's stated reasons were neither genuine nor grounded in consistent workplace policy. These inconsistencies must be evaluated by a jury, and thus summary judgment is inappropriate.

### C. DALY WAS SUBJECTED TO ESCALATING DISCIPLINE WHILE WAKEHAM—WHO ENGAGED IN OVERTLY DISCRIMINATORY AND THREATENING CONDUCT AGAINST THE PLAINTIFF—WAS SHIELDED FROM MEANINGFUL CONSEQUENCES, DEMONSTRATING A HOSTILE WORK ENVIRONMENT.

To state a hostile work environment claim under the ADA, a plaintiff must prove that: (1) he "is a qualified individual with a disability under the ADA"; (2) he "was subject to unwelcome harassment"; (3) "the harassment was based on [his] disability or a request for an accommodation"; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment"; and (5) the defendant "knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999); *Barclay*, 435 F. Supp. 2d at 448. In determining whether a work environment is hostile, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Walton*, 168 F.3d at 667.

i. <u>Plaintiff Is a Qualified Individual with a Disability Under the ADA</u>

Daniel Daly has Thrombocytopenia Absent Radius (TAR) Syndrome, a congenital disorder that substantially limits the use of his upper extremities. As such, Daly is an individual with a disability as defined under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(1)(A), which includes physical impairments that substantially limit one or more major life activities.

Daly's condition significantly impacts manual tasks, a major life activity expressly recognized by the ADA. Daly disclosed his disability to his employer on his first day of work, and it was acknowledged by both Human Resources and management. (Ex. A, Bonner Dep. 29:6–11; Def.'s Br. Ex. B, Daly Dep. 19:17–25.)

Despite his disability, Daly consistently met performance expectations and was recognized by management as a competent employee. James Bonner, Director of People and Culture at Restore, affirmatively described Daly as "a good employee, like anybody else." (Ex. A, Bonner Dep. 45:10–18.) Therefore, Daly satisfies the statutory criteria of a "qualified individual with a disability" under 42 U.S.C. § 12111(8).

ii.    <u>Plaintiff Was Subjected to Unwelcome Harassment</u>

Daly was repeatedly subjected to hostile and demeaning conduct by his direct supervisor, Paul Wakeham, who expressed open frustration with Daly's disability-related limitations. Daly testified that Wakeham routinely exhibited anger when Daly's physical limitations slowed task completion and singled him out with negative treatment. (Def.'s Br. Ex. B, Daly Dep. 40:23–42:23.) This included referring to Daly as "a prick" and "entitled," and most disturbingly, stating: "I've never wanted to beat up a cripple so bad." (Ex. A, Bonner Dep. 35:22–36:3; Def.'s Br. Ex. B, Daly Dep. 44:7–46:5.) This statement is not only objectively offensive—it constitutes a direct physical threat rooted in disability-based animus.

In addition, Daly was subjected to similarly hostile conduct by other employees, including one named "Pip," who slammed items in Daly's presence and exhibited aggressive behavior. (Def.'s Br. Ex. B, Daly Dep. 42:7–23.) This pattern of conduct was unprovoked, unwelcome, and contributed to a work environment where Daly felt unsafe and marginalized. The record amply supports that Daly was subject to unwelcome harassment.

iii.    <u>The Harassment Was Based on Plaintiff's Disability and Requests for Accommodation</u>

The evidence overwhelmingly demonstrates that the hostile conduct Daly endured was directly linked to both his disability and his attempts to obtain a reasonable accommodation. Daly expressed concerns about his inability to reach items in the shop and as a result of this concer, Jim Bonner requested with management the use of a step stool—a minimal and reasonable modification—to assist with Dan Daly's mobility limitations. Management denied the request, citing an unsupported concern that the stool constituted a "tripping hazard," and stated that Daly should "be able to do the job like anybody else." (Ex. A, Bonner Dep. 36:19–21; 40:15–16.) As a result of this request, Daly was referred to as a "problem" by management, and discussions ensued regarding phasing him out of employment at Restore. (Ex. A, Bonner Dep. 48:19–25.) The use of the derogatory slur "cripple" by Wakeham is direct, unambiguous evidence of discriminatory motive. Courts have routinely held that verbal abuse targeting an individual's disability— particularly when it includes threats and epithets—demonstrates that the harassment is disability-based. See *Walton*, 168 F.3d at 667. Accordingly, the causal connection between Daly's disability, his request for accommodation, and the resulting harassment is both direct and well-documented.

iv.    <u>The Harassment Was Sufficiently Severe or Pervasive to Alter the Conditions of Employment</u>

The harassment Daly endured was not isolated or trivial—it was severe, pervasive, and objectively abusive. Wakeham's statement about wanting to physically harm Daly was not only threatening but delivered by a person in a position of authority, exacerbating its impact. Daly testified that the ongoing hostility made him feel unsafe in the workplace and contributed directly to his constructive discharge. (Def.'s Br. Ex. B, Daly Dep. 73:23–75:6.)

Further, after reporting the harassment, Daly was subjected to escalating, vague disciplinary actions that culminated in a final written warning. (Def.'s Br. Ex. B, Daly Dep. 59–60.) This retaliatory conduct occurred without any corrective measures taken against Wakeham, who retained supervisory authority over Daly throughout. Daly's experience is consistent with case law recognizing that repeated, targeted abuse, especially when accompanied by threats and job consequences, is sufficient to alter the terms and conditions of employment. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

v.   Defendant Knew or Should Have Known of the Harassment and Failed to Take Prompt and Effective Remedial Action

The employer's obligation to address harassment is triggered once it knows or should know of the conduct. Here, Daly formally reported Wakeham's discriminatory behavior to both Chris Harren, his supervisor, and Jim Bonner, the Director of People and Culture, via email on June 15, 2022. (Ex. C, Daly Email to J. Bonner) Bonner confirmed that management was aware of the misconduct. (Ex. A, Bonner Dep. 35:10–36:3; 76:13–24.)

Despite the gravity of Wakeham's conduct—including the violent and discriminatory slur—Restore took no meaningful corrective action. Wakeham was merely "written up" and retained his supervisory role. (Def.'s Br. Ex. G, Harren Dep. 48:2–6; Koval Dep. 61:2–20.) No investigation was conducted, no separation between Daly and Wakeham was implemented, and no steps were taken to ensure Daly's safety. In stark contrast, Daly was issued a final warning the day after his complaint—a retaliatory act that further entrenched the hostile environment. (Ex. A, Bonner Dep. 77:1–5.)

This failure to act violates Restore's legal duty to prevent and correct disability-based harassment. The employer's inaction, compounded by retaliatory discipline, satisfies the fifth element under *Walton*.

Plaintiff Daniel Daly has presented substantial and undisputed evidence satisfying each of the five required elements of a hostile work environment claim under the ADA. The conduct he endured was overtly discriminatory, physically threatening, and retaliatory. Rather than taking steps to protect Daly, Restore punished him for asserting his rights under federal law.

This is precisely the type of egregious misconduct the ADA is designed to prevent. The hostile conduct was directly tied to Daly's disability and his efforts to obtain reasonable accommodation. The employer's response was inadequate and retaliatory, reinforcing rather than remedying the discriminatory environment. Accordingly, there are genuine issues of material fact that must be resolved by a jury, and summary judgment must be denied.

### D. THE ADA DOES NOT REQUIRE ECONOMIC DAMAGES TO ESTABLISH AN ADA CLAIM, NONETHELESS, PLAINTIFF HAS SUFFERED ECONOMIC DAMAGES AS A RESULT OF DEFENDANT'S DISCRIMINATORY ACTIONS.

Defendant makes the unusual, and blatantly incorrect, argument that Plaintiff has not established a sufficient record to substantiate damages under the ADA and therefore the Plaintiff's claims should be dismissed. To support this erroneous argument, Defendant asserts that the Plaintiff was able to retain employment with 2-3 weeks of being constructively terminated at Restore. Firstly, under the Americans with Disabilities Act (ADA), a plaintiff does not need to prove damages to establish a claim; rather, the plaintiff must demonstrate the elements of the claim. Specifically, to state a claim under Title II of the ADA, a plaintiff must show that: (1) they are a qualified individual; (2) they have a disability; (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to

discrimination by such an entity; and (4) the exclusion or discrimination occurred by reason of their disability. Indeed, Defendant makes this incredulous argument without citing any legal authority; as there is none to support this conclusion.[3]

Nevertheless, Defendant's own admissions undermine his defense. By asserting that Plaintiff was unemployed for "two to three weeks," Defendant explicitly acknowledges Plaintiff's loss of income during that period. This admission alone sufficiently establishes damages, even though proof of economic damages is not strictly required to maintain a claim under the ADA. Furthermore, the ADA entitles Plaintiff to all remedies available under Title VII, including compensation for emotional distress and mental anguish, attorneys' fees, litigation costs, and injunctive relief. *See* 42 U.S.C. § 12117(a). As such, Defendant arguments fail and Defendant's Motion for Summary Judgment should be denied.

## III.    CONCLUSION

The record before this Court presents compelling and corroborated evidence that Defendant Restore Integrative Wellness, LLC retaliated against Plaintiff Daniel Daly for engaging in protected activity, subjected him to disparate treatment because of his disability, and ultimately forced him to resign under conditions amounting to a constructive discharge. Daly was a capable employee with no disciplinary history during the first four months of his employment. Yet within just over three months of seeking informal accommodation and reporting an egregiously discriminatory remark by a supervisor, he was repeatedly disciplined based on vague, undocumented, and inconsistently applied criticisms. The rapid sequence of escalating

---

[3] While not directly on point, when discussing the scope of Title VII, the Supreme Court explicitly held that the Title VII powers are not "limited to 'economic' or 'tangible' discrimination." *Harris v. Forklift Sys.*, 510 U.S. 17, 18, 114 S. Ct. 367, 369 (1993)

discipline—coinciding precisely with his protected activity and culminating in a final warning that preceded his resignation—strongly supports an inference of pretext and retaliatory motive.

Viewing the evidence in the light most favorable to Plaintiff—as is required at this stage—there are genuine disputes of material fact that must be resolved by a jury. Defendant's motion for summary judgment is thus legally and factually unsupported. For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment in its entirety and permit this case to proceed to trial on all claims.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully Submitted,

*//s/ Joseph F. Leeson,. III*
Attorney for the Plaintiff
Joseph F. Leeson, III. Esq.
PA Bar ID No. 328520
70 E. Broad Street
Bethlehem PA, 18018
Telephone: (610) 691-3320
Email: jleeson@leeson-law.com